IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LORI LYNN FRESHWATER, individually and as Executor of the Estate of Mary Freshwater, | ) ) ) ) |
| | ) Index No: 22-cv-161 |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA | ) ) |
| Defendant | ) ) ) |

# COMPLAINT

COMES NOW, Plaintiff Lori Lynn Freshwater (hereinafter "Plaintiff"), Individually, and as Executor of the Estate of Mary Freshwater, by and through her undersigned counsel, hereby state as follows:

1. This Complaint alleges a federal cause of action and is brought solely pursuant to Section 804(b) of the "Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics (PACT) Act," also known as the "Camp Lejeune Justice Act of 2022" (hereinafter "the Act").

2. The Defendant, United States of America, through its military branches the United States Navy and the United States Marine Corp, has owned and operated Camp Lejeune as a Marine Corp base since 1941.

3. Two water-supply systems on the Marine Corps Base Camp Lejeune in North Carolina were contaminated with the industrial solvents trichloroethylene (TCE) and perchloroethylene (PCE).

4. Upon information and belief, the contamination began in the middle 1950s and

continued until the middle 1980s, when contaminated supply wells were shut down. The sources of the contamination were an off-base dry-cleaning establishment and on-base industrial activities.

5. Contaminated water was distributed to enlisted-personnel family housing, barracks, base administrative offices, schools, a hospital, industrial areas, and recreational areas.

6. Between 1953 and 1987, nearly one million Marines, sailors, civilian employees, and military family members at Camp Lejeune unknowingly drank, cooked with, and bathed in contaminated water.

7. Federal government officials failed to ensure that toxic chemicals from industrial facilities, fuel tanks, and dry-cleaning operations did not seep into the water used by the men and women who were willing to lay their lives on the line for our nation and their families. Indeed, for decades the federal government did not even bother to test the water.

8. Thousands of servicemembers and civilians who resided at Camp Lejeune between the 1950s and the 1980s have contracted serious diseases and chronic conditions as a result of their exposure to the contaminated water, including but not limited to: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; chemically-induced parkinsonism; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects. Camp Lejeune's toxic water has also been linked to widespread birth defects and high rates of stillborn babies.

## JURISDICTION AND VENUE

9. At all times relevant to the allegations contained within this Complaint, Defendant owned, controlled, and/or operated Camp Lejeune, which was and continues to be located on the eastern shore of North Carolina.

10. Defendant is liable for damages caused to Plaintiffs, under the Federal Tort Claims

2

Act, 28 U.S.C. §§ 1346, 2671-80 el seq., as a result of the acts and omissions complained of herein, which were performed by agents, servants and/or employees acting within the course and scope of their employment with Defendant.

11. Defendant is also liable under the Camp Lejeune Justice Act of 2022, Section 804(b) of the Act establishes a cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period of time to obtain relief in this Court.

12. Specifically, "[a]n individual . . . who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." *Id*.

13. To meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2) of the Act.

14. The United States District Court for the Eastern District of North Carolina has exclusive jurisdiction over any action filed under Section 804(b) of the Act and is the exclusive venue for this action. Section 804(d) of the Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## **THE PARTIES**

15. Plaintiff Lori Freshwater is currently a resident of Narragansett, Rhode Island. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise

exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States. Plaintiff has satisfied all conditions precedent to the filing of the instant action.

16. Plaintiff Mary Freshwater was born on May 27, 1944 and passed away on January 17, 2013. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States. Plaintiff has satisfied all conditions precedent to the filing of the instant action.

17. Defendant United States of America is the party responsible for damages caused by its military service components, including responsibility for the United States Navy and United States Marine Corps and related facilities. Defendant has waived its sovereign immunity from suit under Section 804(f) of the Act.

## FACTUAL BACKGROUND

18. Marine Corps Base Camp Lejeune is in Onslow County, North Carolina, southeast of Jacksonville and about 70 miles northeast of Wilmington, North Carolina. The base covers an area in southeastern North Carolina's Coastal Plain and is approximately 151,000 acres (233 square miles), with 14 miles of beach on the Atlantic Ocean.

19. Camp Lejeune began operations in late 1941. The military base has been densely populated throughout its history, with approximately 43,000 active-duty military personnel and 51,000 dependents as current occupants.

20. Hadnot Point housing was constructed and drinking water system began operation. Tarawa Terrace housing was constructed in 1952, and Tarawa Terrace drinking water system began operation.

21. Camp Lejeune's drinking water was extracted from over 100 supply wells, treated at eight treatment plants, and distributed to its residents through a network of water distribution system pipelines. The base housing areas were served by among others, three main water supply and distribution systems that served the base: Tarawa Terrace (beginning in 1952); Holcomb Boulevard (starting June 1972); and Hadnot Point (beginning in 1942). Those systems consisted of a collection of wells, a water treatment plant, and a distribution system.

22. Drinking water samples taken in the early 1980s confirmed that MCB Camp Lejeune's Hadnot Point and Tarawa Terrace water treatment plants were distributing water that contained PCE and TCE. Over the years, contaminants from unlined landfills and leaking, aboveground and underground storage tanks migrated into soil and groundwater at locations across Camp Lejeune.

23. ATSDR has estimated that in 1953, the Hadnot Point drinking water system was first affected by chemicals and Tarawa Terrace drinking water system was affected in approximately 1957.

24. The Marine Corps first discovered the contamination of Camp Lejeune's water supply in the early 1980s, but did not inform veterans, their families, and civilian employees aboard Camp Lejeune about the contaminated wells until years later. The Marine Corps allowed people stationed, living, working, or otherwise located at Camp Lejeune to drink contaminated water until 1987.

25. In 1979, EPA published drinking water standards for THMs, a by-product of drinking water disinfection, and suggested drinking water levels for TCE, a solvent often used for cleaning weapons and machinery.

26. In 1980, EPA published suggested drinking water levels for PCE, a solvent often

5

used for dry cleaning.

27. Camp Lejeune first sampled drinking water for THMs and other chemicals interfered with results in 1980-1981.

28. In 1982, special tap water testing identified TCE and PCE as the chemicals interfering with results.

29. Between 1982-1984, the Navy initiated an environmental cleanup program to identify potentially contaminated sites at Camp Lejeune for further investigation. As part of this effort, drinking water wells near potentially contaminated sites were tested.

30. From 1984-1985, Camp Lejeune began testing drinking water wells. It was discovered that ten wells were identified as being impacted and were removed from service.

31. During 1987-1989, Safe Drinking Water Act ("SDWA") regulations for TCE, benzene, and vinyl chloride were published and became effective and enforceable in 1989. SDWA regulations for PCE became enforceable in 1992.

32. In 1983, Camp Lejeune conducted an initial assessment of the potentially contaminated areas.

33. On October 4, 1989, USEPA added Camp Lejeune to its National Priorities List. Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, (CERCLA), commonly known as the Superfund Law, the Agency for Toxic Substances and Disease Registry (ATSDR) was required to conduct a public health assessment of Camp Lejeune.

34. ATSDR's 1997 public health assessment (PHA) found that people had been exposed to contaminants of concern in the Camp Lejeune drinking water.

**Hadnot Point Water Supply Area**

35. The Hadnot Point treatment plant provided drinking water to the main portion of the base at Camp Lejeune, including most of the barracks and workplaces.

36. The Hadnot Point Fuel Farm was built and installed in 1941 and was comprised of 15 fuel tanks. There was one 600,000 gallon above ground tank, six underground 12,000-gallon tanks, and eight underground 15,000 gallon tanks. The underground tanks were placed at grade and completely covered with soil. The above-ground tank stored diesel fuel while the other tanks stored gasoline, unleaded gasoline, and kerosene. It was discovered in 1979 that the Fuel Farm facilities had leaked an estimated 20-30,000 gallons of fuel into the ground and more particularly into the underground water aquifer.

37. Water from the Hadnot Point water treatment plant was contaminated primarily by TCE (trichloroethylene). Other contaminants in the drinking water included PCE and benzene and TCE degradation products trans-1,2-DCE (t-1,2-dichloroethylene) and vinyl chloride. Supply wells were contaminated by multiple sources: leaking underground storage tanks, industrial area spills, and waste disposal sites. ATSDR modeled the contamination and estimated that at least one VOC exceeded its EPA maximum contaminant level in drinking water during August 1953 and January 1985.

38. The source of the contamination was waste disposal practices at ABC One-Hour Cleaners, an off-base dry-cleaning firm.

39. The ATSDR used a data analysis and modeling approach to reconstruct historical contaminant concentrations. Using these approaches, ATSDR estimated that PCE concentrations exceeded the EPA maximum contaminant level in drinking water from the Tarawa Terrace water treatment plant for 346 months during November 1957-February 1987. The most contaminated wells were shut down in February 1985.

40. Samples of the Hadnot Point distribution system were conducted by the base in May and July 1982, December 1984, and throughout 1985. During the 1982 sampling, measured levels of TCE and PCE in the distribution system of Hadnot Point were as high as 1,400 ppb and 100 ppb, respectively.

41. Vinyl chloride and benzene were also detected in the Hadnot Point distribution system during sampling conducted on or after December 1984.

42. In the Hadnot Point system, the median monthly estimated average concentrations from 1975 to January 1985 of TCE, PCE vinyl chloride and benzene was 366 ppb, 15 ppb, 22 ppb and 5 ppb, respectively.

43. According to the ATSDR, a marine in training at Camp Lejeune consumes an estimated 6 liters of water per day for three days per week and 3 liters per day the rest of the week. Under warm weather conditions, a marine may consume between 1 and 2 quarts of water per hour and shower twice a day. Upon information and believe, the water supplied in the field came from the Hadnot Point water system with both measured and estimated levels of TCE and PCE substantially higher than their MCLs.

**Tarawa Terrace Treatment Plant**

44. The Tarawa Terrace treatment plant provided drinking water to the Tarawa Terrace housing area at the base. Samples of the Tarawa Terrace distribution system were conducted by the base in May and July 1982, and February 1985 onward. During the July 1982 distribution system sampling, PCE was measured as high as 104 ppb and reached a maximum of 215 ppb during the February 1985 sampling.

45. Historical reconstruction modeling of the drinking water contamination indicated that TCE and PCE levels above their current MCLs were likely present in the distribution systems

since the 1950s. The highly contaminated supply wells serving these systems were shut down by February 1985.

46. In the Tarawa Terrace system, the median monthly estimated average concentrations from 1975 to January 1985 of PCE, TCE and vinyl chloride were 85 ppb, 4 ppb and 6 ppb. The median number of months a marine or Navy personnel was stationed at the base was 18 months.

47. Drinking water samples taken in the early 1980s confirmed that MCB Camp Lejeune's Hadnot Point and Tarawa Terrace water treatment plants were distributing water that contained PCE and TCE.

48. Historical record show that in the past, people living and working at Camp Lejeune were exposed to contaminated drinking water. As many as 1 million military and civilian staff and their families have been exposed to the volatile organic compound (VOC)-contaminated drinking water during this 30 plus year period.

49. However, because during the early 1980s these contaminants were unregulated, base officials took relatively few drinking water samples to measure chemical contaminants at the base's water treatment plants; therefore, the extent and duration of exposure was unknown.

50. When tap water was first tested in or about May of 1982, the trichloroethylene level in the Hadnot Point area of Camp Lejeune was as high as 140 parts per billion and in July 1982 in Tarawa Terrace, a residential area of Camp Lejeune there were 104 parts per billion of tetrachloroethylene in the water supply.

51. When testing was performed in or about February of 1985, the trichloroethylene in the water supply system was as high as 1148 parts per billion and, the dichloroethy lene level as high as 406 parts per billion in the Berkley Manor Elementary School area of Camp Lejeune and

the tetrachloroethylene was 215 ppb, with one well supplying the water to consumers at Camp Lejeune having 18,900 ppb of trichloroethylene, 400 parts per billion of perchloroethylene, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride.

52. The current U.S. maximum contaminant levels ("MCLs") for TCE and PCE are 5 ppb. The MCLs for vinyl chloride and benzene are 2 ppb and 5 ppb, respectively. The MCLs for TCE, vinyl chloride and benzene were in effect as of 1989, and the MCL for PCE was in effect as of 1992. Historical reconstruction modeling of the drinking water contamination at Camp Lejeune indicated that TCE and PCE levels above their current MCLs were present in the distribution systems since the 1950s. The most highly contaminated supply wells serving these systems were shut down by February 1985.

53. At no time did Defendant warn the individuals at the base or those coming onto the base that would be reasonably expected to use that water, that said water supply could and/or would potentially harm them and their families.

54. Even after warnings to Defendant by contracted sources, one of the major sources of the contamination was concealed from affected consumers including the Plaintiff by the Defendant until late 2012. Prior to 2012, the Defendant publicly blamed a privately-owned dry cleaners, ABS One Hour Cleaners, for the release of contaminants at Camp Lejeune.

55. It was not until December 2012 that the ATSDR revealed the conclusions of RCRA investigations of leaking above-ground storage tanks (ASTs) and underground storage tanks (USTs), which occurred at approximately 70 locations throughout the Hadnot Point study area.

**Holcomb Boulevard Water Supply Area**

56. The Hadnot Point WTP supplied water to the Holcomb Boulevard area until June, 1972, at which time the Holcomb Boulevard WTP had been constructed and began operating.

10

Individuals who lived within the Holcomb Boulevard area before 1972, the assessment of the health impact of exposure to chemicals in the drinking water is the same as individuals who lived in the Hadnot Point area or anyone who had used Hadnot Point as their primary water source during that time.

57. Intermittently, from 1972 to 1985, the Holcomb Boulevard area received contaminated Hadnot Point drinking water. During such periods, TCE was identified as a contaminant of concern because it routinely exceeded its MCL.

58. For example, during the month of June 1978, when contaminated water from the Hadnot Point WTP supplemented Holcomb system water, the maximum reconstructed TCE concentration exceeded the drinking water standard at Midway Park (23 ppb), Berkeley Manor (51 ppb), and Watkins Village (38 ppb) housing areas.

59. During the month of April, 1981, the maximum reconstructed TCE concentration exceeded the drinking water standard at Berkeley Manor (39 ppb) and Watkins Village (28 ppb).

60. During an 8-day period from January 28 through February 4, 1985, use of Hadnot Point water resulted in a maximum reconstructed-mean monthly TCE concentration that exceeded the drinking water standard at Paradise Point (66 ppb), Midway Park (53 ppb), Berkeley Manor (54 ppb), and Watkins Village (56 ppb) housing areas.

61. The maximum TCE level actually measured in the Holcomb Boulevard water system was 1,148 ppb on January 31, 1985 at the Berkeley Manor Elementary School. Before June 1972, the Holcomb Boulevard area received its drinking water exclusively from Hadnot Point water supply wells. Prior to 1972, the assessment of exposure and risk for Holcomb Boulevard Housing residents would be the same as that for Hadnot Point.

62. In December 2012, the ATSDR released its "Analyses and Historical

Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plant and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina - Chapter D: Occurrence of Selected Contaminates in Groundwater at Above-Ground and Underground Storage Tank Sites," which discusses the occurrence of specific contaminants in groundwater at above-ground and underground storage tanks at Camp Lejeune during the estimated period of water contamination from approximately 1957 to 1987. During that time, petroleum, oils, and lubricants (POLs)- including gasoline, waste oil, diesel, heating oil, and jet fuel were stored in unmonitored, single-walled underground storage tanks. Over time, these underground storage tanks rusted and leaked, thereby contaminating surrounding groundwater.

63. Defendant United States did not release any of its findings that the Hadnot Point Fuel Farm was a source of contamination until December 2012. Prior to this time, very limited information regarding the source of contamination was provided to the public, to include military members, dependents, and other potential victims.

64. At all times relevant hereto, Defendant was required to maintain Hadnot Point Fuel Farm and its water-supply facilities at Camp Lejeune in a manner that was compliant, not only with due care, but also with any and all federal, state, and/or all applicable military regulations, orders, procedures, instructions or standards to ensure there were no defects and/or leaks that would interfere with the health, safety and welfare of all individuals that were reasonably foreseeable to consume or become physically exposed to the water supply systems.

65. For years, the Defendant fraudulently concealed and misled the source of the contamination at Camp Lejeune. It was not until 2012 that the Defendant released any information regarding the Hadnot Point Fuel Farm.

12

66. In 2017, ATSDR published its "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases." As part of its mandate, ATSDR completed several epidemiological studies to determine if Marines, Navy personnel and civilians residing and working on U.S. Marine Corps Base Camp Lejeune were at increased risk for certain health effects as a result of exposure to water contaminated with volatile organic compounds.

67. The 2017 ATSDR report concluded that a causal relationship exists between the following diseases and the contaminants in the Camp Lejeune water supply or a causal relationship is at least as likely as not: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; Parkinson's disease; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects.

68. At all pertinent times Defendant, through its agents, servants and employees, acting within the course and scope of their employment, was fraudulent and willfully and wantonly negligent in failing to exercise due care by causing or allowing various pollutants and contaminants, such as trichloroethylene (TCE), as well as PCE and refined petroleum products, such as benzene, toluene, ethylbenzene, and xylenes (BTEX) to leak and contaminate the base water supply in quantities that Defendant knew or should have known were dangerous to the life, health and welfare of those to whom they were supplying the water, including Plaintiff herein.

69. Subsequent to Defendant's knowing or having reason to know dangerous and/or hazardous chemicals were being released, Defendant had the duty to warn the consumer to whom it was supplying said water, even if the harmful effects were uncertain or unknown.

70. The base command already knew as early as 1979 of the possibility of contaminants leaking from the water system, i.e., defective improvements to real property, and the potential

13

health hazard to the persons expected to use the water supply, but was fraudulent and willfully in concealing the contamination and the threat to human health and wantonly negligent in failing to take the necessary steps to warn, examine, survey, protect and/or take reasonable steps to provide a safe water system to the consumer personnel at Camp Lejeune, including Plaintiff herein.

71. At all times relevant, agents, servants, and/or employees of Defendant, acting within the course and scope of their employment, fraudulently caused or permitted large quantities of contaminants to be leach into the aquifers, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous substances and the source of said contaminants, that Defendant knew or should have known were leeching into the aforementioned water supply system.

72. At all times relevant, Defendant knew or should have known that the leakage was causing the water to be contaminated and would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, autoimmune deficiencies, central nervous system disturbances in humans, disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system.

**The Camp Lejeune Justice Act of 2022**

73. On August 10, 2022, the President signed into law the Camp Lejeune Justice Act of 2022. The purpose of the legislation is to, inter alia, supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune.

74. Section 804(b) of the Act establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune. It provides that:

> an individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp

14

Case 7:22-cv-00161-M-RN   Document 1   Filed 08/31/22   Page 14 of 18

Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

75. The Act "appl[ies] only to a claim arising before the date of enactment of this Act." The statute expressly incorporates the FTCA's requirement that a claim must be presented to the relevant federal agency before the judicial action may proceed. Section 804(h) of the Act (cross-referencing 28 U.S.C. § 2675). Under that provision, if the federal agency fails to make a final disposition of a claim within six months of its filing, the claim is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

76. The Act makes clear that a plaintiff may obtain a recovery for a "latent disease." Section 804(e)(1).

77. To meet the burden of proof under the Act, a plaintiff must only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2).

78. The Act includes its own statute of limitations and expressly makes inapplicable any other statute of repose or statute of limitations. Section 804(j). The Act's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of—(A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." *Id*.

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

79. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

80. Plaintiff Lori Freshwater resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune,

15

North Carolina, that was supplied by, or on behalf of, the United States.

81. Plaintiff Mary Freshwater resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

82. During this time, Plaintiffs were exposed to amounts of water supplied by Defendant or its agents at Camp Lejeune. The water supplied to Plaintiffs by or on behalf of Defendant was polluted and contaminated as described herein with chemicals including but not limited to TCE, PCE, vinyl chloride and benzene.

83. Subsequently, Plaintiff Lori Freshwater was diagnosed with multiple serious life-threatening illnesses, including Chronic sinusitis, major depressive disorder, Raynaud's and other autoimmune issues, on a date before the enactment of the Act.

84. Subsequently, Plaintiff Mary Freshwater was diagnosed with multiple serious life-threatening illnesses, including a loss of child due to birth defect – born without cranium (Charles Warner Thorpe (born and died 2/17/79), loss of child due to spina bifida (born 11-30-77; died 1-1-78), miscarriage of twins, acute myeloid leukemia, and adult acute lymphoblastic leukemia, on a date before the enactment of the Act. As a direct and proximate cause of her exposure, Mary Freshwater passed away on January 17, 2013., on a date before the enactment of the Act.

85. A causal relationship exists between each Plaintiff's illnesses and the contaminants each Plaintiff was exposed to in the Camp Lejeune water supply. The causal relationship is at least as likely as not.

86. On or about October 17, 2012, Plaintiff Lori Freshwater filed an administrative claim, individually and on behalf of herself and Mary Freshwater, for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the

claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

## CLAIM FOR RELIEF

87. Plaintiffs respectfully request that, pursuant to Section 804 of the Act, the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiffs Lori Freshwater and Mary Freshwater that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

88. Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 804 of the Act.

Dated: New York, New York
       August 31, 2022

Respectfully submitted,

**GREG JONES LAW, P.A.**

By: */s/ Greg Jones, Esq.*

Greg Jones, Esq.
1213 Culbreth Dr Suite 317
Wilmington, NC 28405
Tel: (855) 566-3752
greg@gregjoneslaw.com

**NAPOLI SHKOLNIK**

Hunter J. Shkolnik, Esq. (*PHV Forthcoming*)
Paul J. Napoli, Esq. (*PHV Forthcoming*)
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tel: (833) 271-4502
hunter@napolilaw.com
pnapoli@nsprlaw.com

Patrick Lanciotti, Esq. (*PHV Forthcoming*)
Nicholas Mindicino, Esq. (*PHV Forthcoming*)
360 Lexington Avenue, 11th Fl.

17

New York, New York 10017
Tel: (212) 397-1000
planciotti@napolilaw.com
nmindicino@napolilaw.com

**ELAW FIRM PLLC**

Elisa D'Amico, Esq. (*PHV Forthcoming*)
1629 K Street NW, Suite 300
Washington DC 20006-1631
elisa@elawfirm.io
Tel: 202 204 2222
elisa@elawfirm.io

*Counsel for Plaintiffs*